LEVAL, J.,
concurring.
I join in my colleagues’ ruling but somewhat unhappily. As I see it, there are arguments which might conceivably rebut the reasoning of the majority opinion, but those arguments have not been advanced in the litigation. In a matter of this complexity, especially when all sides are represented by excellent counsel, I think it more prudent not to venture beyond the contentions that have been fully argued. Perhaps Argentina did not raise these arguments because it recognizes them to be without merit. Perhaps CVI would have had good answers, had the arguments been advanced. I nonetheless will set forth in brief the concerns that leave me with doubts.
The essential cog of my colleagues’ ruling is that, if the contemplated exchange for new bonds were performed, the literal terms of Section 6.01 of the Collateral Pledge Agreement mandate that during the course of the exchange, the collateral securing the original issue of Brady bonds would revert to Argentina, free and clear of any lien in favor of the bondholders, whereupon CVI’s attachment would take hold of the collateral, diverting it from its intended role of providing collateral for the new substitute bonds to the satisfaction of Argentina’s debt to CVI. Argentina has not disputed this reading of § 6.01. Argentina contends rather that, in this circumstance, § 6.01 is overridden by other provisions of the Agreement.
There are two arguments not made by Argentina which seem to me potentially capable of refuting this essential step in the reasoning of the majority opinion. I set them out briefly.
I. The first argument focuses on the seniority of competing claims. Regardless of the meaning of § 6.01, the collateral does not revert to Argentina free and clear in the performance of the contemplated exchange because the exchange agreement commits it to be used as continuing security for the bondholders — in part for the immediate payment of a part of the obligation it originally secured, and in part to secure payment at a later date of the new bonds issued to cover the remainder of the debt. It is clear beyond question that Argentina would not be free to grab the collateral and run, using it for its own purposes and leaving the Brady bondholders high and dry. If Argentina attempted to do so, claiming authority over the collateral under § 6.01, a court at the insistence of the bondholders would enforce the terms of the exchange agreement, barring Argentina from diverting the collateral from its agreed use as security for the bondholders.
CVI would of course assert that its attachment predates the lien created by the exchange agreement and is therefore senior to it. But it is not clear to me that a court of equity should, or would, deem the lien securing the new substitute bonds as a new lien rather than as a continuation, in slightly altered form, of the bondholders’ preexisting lien. The mere fact that Argentina and the bondholders have agreed to alter the schedule under which the collateral is used to pay the debt owed to the bondholders does not alter the fact that the collateral is still reserved for the sole purpose of paying the debt it originally secured. If at any time any part of the collateral in fact becomes available to Argentina for other uses, it will unquestionably be vulnerable to seizure under the attachment, but that does not necessarily *275 mean that a court would deem this to have happened merely because of the substitution of a new agreement for the old.
To illustrate the argument, we might consider hypothetical situations which similarly involve the use of the collateral to secure new substitute bonds issued after a creditor of Argentina obtained an attachment.
a) Suppose as the first example that, after grant of an attachment to a creditor of Argentina, new bonds are to be issued with the agreement of all parties to the Brady bonds to replace the old, with repayment secured by the same collateral. The sole reason for the replacement is the discovery of a potentially confusing typographical error in the original bonds — perhaps the typographer’s accidental omission of a “not” in some obscure provision which is immaterial to the attaching creditor’s interests. Apart from the correction of the typographical error, the terms of the new substitute bonds are identical to the terms of the old replaced series.
b) Alternatively, after grant of an attachment to a creditor, a change in the tax laws of some country threatens to subject to a new onerous tax bonds which have a feature that is present in the boilerplate of the Brady bonds. Because the presence or absence of that tax-triggering feature is of no meaningful significance either to Argentina or the holders, they enter into an agreement to substitute new bonds for the old, which are identical in all respects except for the elimination of the problem clause.
In each case, the attaching creditor pounces at the moment of the exchange, demanding of the court that the collateral be seized to pay the debt owed to it. The terms of § 6.01 would appear to apply to these hypothetical cases in exactly the same way as they apply to the facts now before us. The attaching party would assert that, because its attachment predates the exchange agreement, its attachment is senior to the pledge under the new amended bonds.
Notwithstanding the chronological sequence and the identical application of § 6.01, I have difficulty imagining that a court of equity would accept so inequitable a resolution. The attaching party’s claim of seniority would give it windfall of full recovery while stripping the other bondholders of their collateral. The Brady bonds previously secured one hundred cents on the dollar as to principal by United States Treasury obligations would become unsecured obligations of Argentina. The attaching creditor would succeed by a strategic maneuver in pole vaulting over the other similarly placed creditors, achieving full payment leaving the others with nothing. I think it highly likely that a court of equity would deem the new substitute pledge of the collateral as a continuation of the old pledge, thus retaining its seniority over the prior attachment.
If I am correct in that speculation, the question then arises whether this exchange is meaningfully different because the present alteration of terms regarding the schedule of payment diminishes the likelihood of a reversion of the collateral to Argentina that would bring the attachment to fruition. The immediate use of part of the collateral to pay a part of the principal of the bonds diminishes the opportunities for some turn of events between now and the original maturity date that might result in Argentina’s payment of the bonds from some source other than the collateral, which event would cause the reversion of the collateral to Argentina, subject to the attachment. I am not sure, however, that this difference has any pertinence. So long as the collateral is not diverted by Argentina to uses other than the satisfac *276 tion of its debt represented by the Brady bonds, it seems to me questionable whether the substitution of a new calendar for use of the collateral to pay the Brady bonds should be deemed to forfeit the seniority of the bondholders’ lien. If Argentina were to reach agreement with bondholders to cancel the bonds altogether upon surrender to the bondholders of 100% of the collateral, this would eliminate all possibility of the attachment ever bearing fruit. Does that necessarily represent an unfairness to the attaching creditor given that the entire collateral was expected from the first to be consumed in payment of the bonds? The crucial question as to seniority, it seems to me, would not be whether the new arrangement diminishes the likelihood of the fruition of the attachment, but whether by the new arrangement Argentina succeeds in using the collateral for its own purposes going beyond its original role of securing the debt represented by the Brady bonds. The issue in any event has not been raised in this litigation.
II. A second argument not advanced by Argentina which, I think, might conceivably have rebutted CVI’s position is that § 6.01 of the Collateral Pledge Agreement, notwithstanding ambiguity, was never intended by any contracting party to apply to an exchange of this nature. Section 6.01, which contains what my colleagues described as a “quirk” of drafting, was created to govern an entirely different situation. The section provides (omitting distracting inessentials),
Section 6.01. If ... Argentina redeems ... or purchases or exchanges ... any ... Principal Bond and surrenders such Principal Bond to the Fiscal Agent for cancellation ..., the Fiscal Agent shall, upon the request of Argentina ... send to the Collateral Agent a Request for the Release of Principal Collateral____ If ... the Collateral Agent receives such a Request for the Release of Principal Collateral ... the Collateral Agent shall ... deliver ... in accordance with the instructions given by Argentina ... Pledged Securities [i.e., collateral] [in corresponding amount]. Upon such ... delivery, the Lien of this Agreement in favor of the Holders ... shall terminate, such [collateral] shall be free of the Lien of this Agreement and all rights with respect to such [collateral] shall revert to Argentina, (emphasis added).
The provision’s intended purpose is clearly apparent. At least in theory the possibility existed that at some point during the long life of the bonds, Argentina might purchase, redeem, or exchange them, employing resources other than the collateral provided by the United States Treasury. For example, Argentina and bondholders might have found it mutually advantageous to cancel the bonds and for Argentina to assign instead to the bondholders an interest in a number of years of Argentina’s grain production or in acreage in the Pampas. Alternatively, Argentina might simply buy bonds and submit them for cancellation. In any such event, after the bonds had been purchased or exchanged and cancelled, the collateral would no longer serve its intended purpose of securing the payment of the bond principal. The purpose of § 6.01 was to make clear that when bonds have been so purchased, redeemed, or exchanged, and cancelled, the collateral, being no longer employed in its originally intended use, reverts to Argentina.
While § 6.01 was undoubtedly intended to apply to any such purchase, redemption or exchange achieved by Argentina through use of resources other than the collateral, I think it questionable whether this section providing for free and clear reversion to Argentina was ever intended or understood by any participant in the Brady bond agreements as having applica *277 tion to a circumstance in which a substitute agreement between Argentina and the holders of the original bonds is financed by use of the collateral. Where an exchange agreement is dependent on the continuing use of the collateral to satisfy the debt owed to the bondholders, such new agreement is inconsistent with Argentina’s obtaining a free and clear reversion. More importantly, as this case illustrates, deeming the collateral to have reverted free and clear to Argentina in the performance of such an exchange makes it vulnerable to attachment by any creditor of Argentina, thus threatening to leave empty-handed the bondholders who in good faith believed they were exchanging one collateralized security for another.
It appears at least arguable that the present transaction does not necessarily conform either to the intended purposes or to the literal terms of § 6.01. Because § 6.01 was drafted to make clear Argentina’s absolute entitlement to the reversion of the collateral when the collateral is no longer employed to secure the Brady debt, the provision of § 6.01 for such reversion requires as a preliminary step that Argentina make, through the Fiscal Agent, a “Request for the Release of Principal Collateral.” (The Fiscal Agent then forwards the Request for the Release to the Collateral Agent, which then delivers the collateral pursuant to Argentina’s instructions, free and clear of the lien in favor of the bondholders). Under the present exchange agreement, however, (as well as under the hypothetical situations outlined above) Argentina would not demand that the collateral be released. Its instructions would be rather that the Collateral Agent retain the collateral as security for the Brady bondholders, using part for immediate redemption of a part of the Brady debt, and holding the remainder as security for the remainder of the Brady debt under the newly agreed schedule. It is therefore not clear to me that the sequence of events would conform to the sequence described in § 6.01 that results in free and clear reversion of the collateral to Argentina.
Arguably at least, the section is ambiguous as to whether the contractual term “Request for the Release of Principal Collateral” covers not only a demand by Argentina for the delivery of the collateral to it free and clear of the bondholders’ lien, but also a demand to continue to employ the collateral to secure the Brady debt.
As these contracts are of enormous complexity and these issues of interpretation have not been debated by the parties for our edification, I take no position on them. Perhaps these questions will be debated in some future litigation involving either Argentina’s or another nation’s Brady debt. Perhaps they will be seen to have no relevance and be discarded. In any event, for today’s case I concur in my colleagues’ ruling.